Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

JSK

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3441 | **DATE** | 9/18/2003 |
| **CASE TITLE** | Cichon vs. Exelon Generation Co | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Ruling held. **ENTER MEMORANDUM OPINION:** We grant Exelon's motion (Doc 28-1) for summary judgment. Final judgment entered.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | SEP 18 2003 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | U.S. DISTRICT COURT CLERK | IS | 43 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 03 SEP 18 PM 2:45 | date mailed notice | |
| SCT | courtroom deputy's initials | FILED FOR DOCKETING L-03 | mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

MICHAEL C. CICHON, )
)
Plaintiff, )
)
vs. ) 02 C 3441
)
EXELON GENERATION CO., )
)
Defendant. )

**DOCKETED**
**SEP 1 8 2003**

## MEMORANDUM OPINION

CHARLES P. KOCORAS, Chief District Judge:

This matter comes before the court on Defendant Exelon Generation Company's motion for summary judgment. For the reasons set forth below, the motion is granted.

## BACKGROUND[1]

---

[1] The following facts are compiled from Defendant's Statement of Uncontested Material Facts ("Statement") and from Plaintiff's Response. A court in the Northern District of Illinois is "entitled to limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' statements." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Local Rule 56.1 prescribes the consequence for noncompliance: the movant's assertions of fact are deemed admitted, regardless of what contrary evidence is in the record. *Id.* It should be noted that many of the facts advanced by the Plaintiff (and to a much lesser degree Defendant) were not accepted due to the failure to comply with Local Rule 56.1. Examples of Plaintiff's failure to comply with Local Rule 56.1 include: (1) making new factual assertions in its response without filing a Statement of Additional Facts in violation of Local Rule 56.1(b)(3)(B); (2) improperly denying a large number of
(continued...)

43

Exelon Generation Company ("Exelon") is a subsidiary of Exelon Corporation and operates five nuclear power plants in Illinois. Plaintiff Michael Cichon ("Cichon") began working at Exelon's plant in Byron, Illinois ("Byron Plant") around 1983. Cichon worked in various positions at the Byron Plant, advancing over the years. In February 1998, Cichon obtained the lower-level managerial position of Unit Supervisor for the plant's Operations Department. The Operations Department is responsible for running the Byron Plant's control room. As a Unit Supervisor, Cichon was responsible for supervising and directing the operations of the plant's twin nuclear reactors. This entailed giving directions and orders to the reactor operators, who would physically manipulate the reactors' controls pursuant to Unit Supervisors' directions. In 2001 there were approximately twenty Unit Supervisors at the Byron Plant.

In June 1999, the Byron Plant changed its overtime pay practices for certain employees in managerial positions. Displeased with these overtime policy changes, twenty-seven Byron Plant employees filed a charge with the Illinois Department of Labor and forty-two employees instituted a federal lawsuit. Cichon was aware of both of these actions but chose to join neither. However, Cichon also disapproved of the

---

[1] (...continued)
Exelon's facts with evasive responses in violation of Local Rule 56.1(b)(3)(A); and (3) supporting its responses with self-serving affidavits or unauthenticated documents. See *Rogers v. City of Chicago*, 320 F.3d 748, 751 (7th Cir. 2003); *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001).

new overtime policies and shared his views with certain coworkers. On May 10, 2001, unbeknown to Exelon, Cichon paid an attorney a retainer to prepare to file a separate class action lawsuit concerning the overtime changes.

Even though he had ascended the ranks at the Byron Plant for over fifteen years (the Unit Supervisor job was his first managerial position), beginning in early 2000 Cichon's supervisors started questioning his leadership and supervisory capabilities. On numerous occasions between January 2000 and October 2001, Cichon was coached by supervisors who expressed their opinions concerning his managerial practices, specifically that he was more closely aligned with his subordinates than with management. Cichon also frequently questioned directives from management in front of his subordinates, leading his immediate supervisor to coin the acronym "N.E.I.B.S" (Not Everything Is Bull Shit) and use the term as a retort to Cichon's negative comments.

An example of a particular incident that caused Exelon supervisors to criticize Cichon's leadership occurred on June 26, 2001. Cichon was the Unit Supervisor in charge of one of the Byron Plant's nuclear reactors when a malfunction occurred that required that reactor to be shut down. During the reactor restart process, Cichon failed to follow certain procedures that, while never endangering the plant or public, required Exelon to conduct an internal investigation and prepare a report for the Nuclear

Regulatory Commission ("NRC"). This incident resulted in the Byron Plant having to reset its "Event Free Clock" with the NRC. On August 7, 2001, Exelon issued Cichon a formal written warning concerning his failure to adhere to procedural guidelines. The warning stressed that Cichon needed to improve his performance and that "failure to do so will result in additional discipline up to and including termination." Pl. Ex. 18 at 0030.

Based on the reactor shutdown and other problems, in July 2001 Byron Plant management became concerned with performance and procedural adherence within its Operations Department. They felt it necessary to reevaluate the Operations Department's managerial team and initiated a top-to-bottom "re-alignment" of the department. This was accomplished through a leadership assessment process that was designed in part to evaluate those Operations Department employees in leadership and supervisory roles. The goal of the process was to improve safety and effectiveness by ensuring that proper supervisory personnel were in place. The leadership assessment included interviews of all supervisors and managers in the Operations Department, starting with the Operations Director and working down to the Unit Supervisor level. Basically, all supervisors in the Operations Department had to undergo an interview in order to retain their position in the department. The leadership assessment

interviews evaluated supervisors based on their leadership, management, and behavioral skills, rather than on their technical abilities.

The leadership assessment altered the composition of the Operations Department's managerial team. For the most part, the employees with the highest scores retained their positions or were promoted, while those with lower scores were assigned to different positions or fired. For instance, by the time that Exelon was interviewing employees at Cichon's Unit Supervisor level, it had already been announced that all Superintendent-level supervisors (a higher level than Unit Supervisor) would be replaced. The process would also result in four out of nine Shift Managers (also levels above Cichon) being removed from their positions through demotion or termination. By September 2001, Cichon and the other Unit Supervisors were aware that the Operations Department was being restaffed and that they would soon be interviewed.

On September 7, 2001, Cichon directed his attorney to file a lawsuit concerning the 1999 overtime changes, naming himself and four other Byron Plant employees as plaintiffs. However, because of the September 11 catastrophe, Cichon's attorney did not file the lawsuit until September 25. Filed in the Northern District of Illinois, the suit alleged violations of the Fair Labor Standards Act ("FLSA"). 29 U.S.C. §§ 201

et seq.[2] Exelon's Legal Department, located in Chicago, received a copy of the lawsuit on September 28. Management at the Byron Plant did not become aware of the suit until October 2, when an e-mail acknowledging the suit was sent from Exelon's human resources department to upper management at Byron.

On September 10, Cichon underwent his leadership assessment interview. Unit Supervisors, including Cichon, were interviewed by a panel consisting of superiors within the Operations Department as well as representatives from human resources. Certain interviewers were not satisfied by Cichon's responses to questions related to his management and leadership abilities. Cichon received the lowest score possible in eight of the eleven leadership areas as well as in three other categories. The interviewers concluded that Cichon was an "acceptable candidate for the short term" but in the "long term [he] does not possess the leadership skills that provide a good motivational fit for the position." Def. Statement at ¶ 97. The panel was concerned that Cichon's leadership would adversely affect the development of Cichon's subordinates if he retained his position as a Unit Supervisor.

On October 1, 2001, the Unit Supervisor interviews had been concluded and the interviewing panel met to determine which employees would staff the Unit Supervisor

---

[2] This overtime pay suit, *Meyers v. Exelon*, No. 01 C 7399, was dismissed with prejudice on September 12, 2002.

positions. The panel determined that Cichon would not be selected as a Unit Supervisor. The panel also determined that two other low scoring Unit Supervisors, neither of whom were involved in Cichon's lawsuit, would be demoted in terms of position or pay level.[3]

On October 23, 2001, Cichon was told at a meeting with superiors that there was no longer a position for him within the Operations Department at the Byron Plant. He was also told that his leadership assessment interview revealed deficiencies in his ability to supervise employees. Under Exelon's policies, Cichon had sixty days to find another position within the company. During that period he remained an active Exelon employee. He applied for nineteen open positions and was interviewed for six. However, Cichon did not meet the minimum qualifications for many of these positions. Cichon was a finalist for the position of Turbine Project Manager, a position he coveted. Cichon was initially told by a superior that he would be "good fit" for the job but he subsequently scored lower on an interview than another applicant and was not selected for the position. Cichon continued to search for work with Exelon and on December 22, 2001, Cichon accepted a position at a Joliet facility of Commonwealth Edison, a subsidiary of Exelon's parent company. Cichon is currently a dispatcher for

---

[3] It is disputed whether the interviewing panel had the final say concerning Cichon's employment status.

Commonwealth Edison, a job that pays less than his previous position as Unit Supervisor.

On May 13, 2002, Cichon filed the present lawsuit, alleging that he was fired and denied subsequent employment in violation of the FLSA's anti-retaliation provision. 29 U.S.C. § 215(a)(3). Exelon moves for summary judgment on Cichon's FLSA claim.[4]

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On summary judgment the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting

---

[4] Cichon's Amended Complaint contained two counts, the present FLSA claim and a common law retaliatory discharge claim. The second count was previously dismissed by this court. *Cichon v. Exelon Generation Co.*, 2002 WL 31455986 (N.D. Ill. Nov. 1, 2002). Cichon includes this second count in his Amended Complaint for purposes of appeal but in light of our previous decision we will not revisit the second claim on this motion.

specific evidence on a particular issue or by pointing out "an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court must consider the record as a whole in a light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. *Id.* at 255; *Bay v. Cassens Transport Corp.*, 212 F.3d 969, 972 (7th Cir. 2000).

## DISCUSSION

The FLSA makes it unlawful for an employer to "discharge or in any other manner discriminate against any employee" for engaging in activities protected under the statute, including filing suit under the FLSA. 29 U.S.C. § 215(a)(3). While it has not yet applied the following standard to FLSA retaliation claims, the Seventh Circuit has established an explicit formulation for analyzing retaliatory employment actions brought under Title VII. *See Stone v. City of Indianapolis Pub. Utils. Div., 281 F.3d 640, 641 (7th Cir. 2002); and Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002), *cert. denied*, 123 S. Ct. 97 (2002). However, because the Seventh Circuit

has previously used the same framework to analyze FLSA retaliation claims as it has for Title VII, *see, e.g., Scott v. Sunrise Healthcare Corp.*, 195 F.3d 938, 940 (7th Cir. 1998), the following *Stone/Hilt-Dyson* retaliatory employment action analysis is appropriate in the FLSA context.

A plaintiff in an employment retaliation case has two distinct approaches to prevent summary judgment from being granted. *Stone*, 281 F.3d at 644. The first route requires the plaintiff to present direct evidence that he engaged in protected activity (such as filing an overtime suit under the FLSA) and suffered an adverse employment action based on the employer's retaliatory intent. *Id.* The second approach to summary judgment involves the indirect proof, burden-shifting analysis first defined in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *Stone*, 281 F.3d at 644. Cichon offers no direct evidence of his employer's retaliatory intent and instead must take the indirect proof approach.

Under this indirect proof methodology an employee must first present evidence sufficient to establish a *prima facie* case that his employer retaliated against him in violation of a statute's anti-retaliation provisions. *Hilt-Dyson*, 282 F.3d at 645. If the employee fails to establish any element of the *prima facie* case (see below), the employer is entitled to summary judgment. *Id.* If the employee succeeds in establishing his *prima facie* case, the employer must offer a "legitimate, non-invidious

reason for the adverse employment action." *Id.* If the employer can do so, the burden of production shifts back to the employee to demonstrate that the employer's justification was pretextual. *Id.* If the plaintiff cannot do so the "retaliation claim cannot survive summary judgment." *Id.*

## I. Cichon's *Prima Facie* Case

To make out a *prima facie* case of retaliation to prevent summary judgment, Cichon must demonstrate that all of the following conditions are satisfied: (1) he engaged in statutorily protected activity; (2) he performed his job according to his employer's legitimate expectations; (3) despite meeting his employer's legitimate expectations, he suffered a materially adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Hilt-Dyson*, 282 F.3d at 645.

It is undisputed that Cichon filed the *Meyers* FLSA lawsuit on September 25, 2001. This satisfies his first *prima facie* requirement as "protected activities" include filing any complaint under or related to the FLSA. 29 U.S.C. § 215(a)(3); *Sapperstein v. Hager*, 188 F.3d 852, 857 (7th Cir. 1999).

As to the second requirement, the facts are disputed by the parties: Exelon claims that Cichon's low scores on the leadership assessment, his record of disputes with his superiors, his involvement with the reactor shutdown incident, and his inferior

-11-

score on the Turbine Project Manager interview indicate that Cichon failed to meet Exelon's expectations. On the other hand, according to Cichon, his predominant job responsibility was to ensure reactor safety, and he contends that he met those expectations. He also asserts that, while looking for a new position within the company, a superior informed Cichon that he would be a good fit for the Turbine Project Manager. While this comment may be true, it cannot be viewed as an informal opinion as to whether Cichon was meeting expectations as a Unit Supervisor. Nevertheless, for purposes of discussion, we will assume the second requirement was met.

Cichon's next requirement for establishing a *prima facie* case of retaliation is to show that he suffered a "materially adverse employment action." *Hilt-Dyson*, 282 F.3d at 465. Traditional examples of adverse employment action include being demoted, fired, or passed over for a promotion. *See Harris v. Ashcroft*, 2003 WL 22048154, *2 (7th Cir. 2003). Cichon satisfies this requirement by offering evidence that he was removed from his position as Unit Supervisor, told he could no longer work in the Byron Plant's Operations Department, and subsequently accepted less desirable employment with Commonwealth Edison.

The facts concerning Cichon's final *prima facie* requirement for surviving summary judgment, that he was treated less favorably than similarly situated

employees who did not engage in statutorily protected activities, *Hilt-Dyson*, 282 F.3d at 485, are also in dispute. The Seventh Circuit has yet to settle on a single formulation for determining when employees are similarly situated. The more demanding approach requires the plaintiff-employee to demonstrate that there is another employee who is "directly comparable to him in all material respects." *See Grayson v. O'Neill*, 308 F.3d 808, 819 (7th Cir. 2002). A second, more relaxed formulation states that the "employee need not show complete identity in comparing himself to the better treated employee," but rather that he must only "show substantial similarity" based on "performance, qualifications, and conduct." *See Radue v. Kimberly Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000). This second standard can be established by showing that the comparable employee and the plaintiff "dealt with the same supervisor, were subject to the same standards, and engaged in similar conduct without such differentiated or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 2003 WL 22019826, *6 (7th Cir. 2003) (quoting *Radue*, 219 F.3d at 617-18). However, both approaches seem to be in agreement that for this inquiry, a court "must look at all relevant factors, the number of which depends on the context of the case." *Grayson*, 308 F.3d at 819 (quoting *Radue*, 219 F.3d at 617).

While many of the facts surrounding this inquiry remain in dispute, Cichon identifies at least two instances where he was treated less favorably than similarly situated coworkers. Following the leadership assessment process, two other Unit Supervisors, who did not join Cichon's FLSA lawsuit and also scored poorly on their evaluations, were demoted to a lower position or were forced to accept a lower salary. Even though these two employees received undesirable treatment from Exelon as a result of the leadership assessment process, they received more favorable treatment than Cichon in that they were not terminated. Cichon also points to his bid to become Turbine Project Manager after losing his Unit Supervisor position. Of all the employees to apply for the position, Cichon was one of only two candidates for the position that were considered finalists. This other employee, who was not involved in the FLSA suit and who would be chosen to fill the Turbine Project Manager position, was similarly situated to Cichon in that the two were considered the only candidates that were well qualified for the job. Because Cichon has identified similarly situated coworkers in both the Unit Supervisor assessment and the Turbine Project Manager selection processes, this court cannot grant judgment as a matter of law that Cichon has not satisfied this final *prima facie* requirement under the *Stone/Hilt-Dyson* framework.

**II. Exelon's Proffered Reasons for Its Actions**

Because Exelon has failed to show that Cichon cannot meet the *prima facie* requirements for a retaliation claim, the burden shifts to the Exelon to offer a "legitimate, non-invidious reason" for its adverse employment action against Cichon. *Hilt-Dyson*, 282 F.3d at 465. Exelon provides ample evidence to meet this burden. The record indicates that Exelon initiated its realignment of the Byron Plant's Operation Department before Cichon filed his lawsuit and that all employees in supervisory roles were evaluated. There were many other Operations Department supervisors who suffered adverse employment action as a result of the evaluation. In the year prior to the leadership assessment process there were instances where Cichon's supervisory and behavioral abilities were called into question. Such leadership and managerial skills were important factors in the leadership assessment. Cichon's shortcomings in these areas constitute a legitimate reason for his poor showing on the leadership assessment and Exelon's decision to remove him from his position as Unit Supervisor. As for Cichon's failure to secure one of the many jobs that he applied for following his initial termination, the record indicates that he either lacked the requisite technical expertise for certain positions or that other employees were evaluated as more qualified. These are legitimate, non-invidious reasons to support Exelon's decisions concerning Cichon's employment.

## III. Cichon Fails to Demonstrate Pretext

Once an employer has offered a legitimate reason for its action, the burden of production shifts back to the employee to demonstrate the pretextual nature of the employer's reason and, if the employee fails, his retaliation claim cannot survive summary judgment. *Hilt-Dyson*, 282 F.3d at 465. Under the burden shifting analysis first formulated in *McDonnell-Douglas*, "pretext" means "a phony reason for some action" that "is unworthy of credence." *Logan v. Kautex Textron, N.A.*, 259 F.3d 635, 640 (7th Cir. 2001). In order to demonstrate pretext an employee must demonstrate that the employer's articulated reason for its actions either: (1) had no basis in fact; (2) did not actually motivate its decision; or (3) was insufficient to warrant the action. *See Grayson*, 308 F.3d at 820; *Logan*, 259 F.3d at 640. It is this final step in the *Stone/Hilt-Dyson* analysis where Cichon fails to meet his burden. The record indicates that Cichon's poor performance on the leadership assessment evaluation was Exelon's primary articulated reason for discharging Cichon from the Unit Supervisor position. Cichon offers no evidence that Exelon lacked a reason to conduct the leadership assessment, that the results of his evaluation lacked factual basis, that the results did not motivate Exelon's decisions, or that they were insufficient to warrant his removal. Nor can he counter the fact that the leadership assessment was initiated and his unfavorable interview occurred in advance of Cichon filing the lawsuit and certainly

before any of his superiors knew of the lawsuit. Even though he was the only evaluated supervisor to file a FLSA lawsuit, he was not the only one demoted or fired. Because courts should "not sit as super-personnel departments, second-guessing an employer's facially legitimate business decisions," *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003), we should not strain to infer that Exelon fabricated its shake-up of the entire Operations Department in order to get rid of Cichon.

Just as Cichon cannot demonstrate pretext as to Exelon's actions before it learned of his FLSA lawsuit, he cannot counter Exelon's justifications for its actions after October 2, 2001, when Byron Plant management became aware of Cichon's suit. Cichon's strongest claim, which is disputed, is the general assertion that the decision to terminate his employment and the subsequent decisions not to hire him for his desired position were the result of his superiors becoming aware of his lawsuit. *Stone* tells us that more proof is required as "mere temporal proximity between the filing of the [lawsuit] and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue." *Stone*, 281 F.3d at 644. As this court has previously noted, the timing of an employee's filing a lawsuit is not sufficient to demonstrate pretext. *Buckner v. Ill. Dep't of Children and Family Servs.*, 2003 WL 187408, *2 (N.D. Ill. 2003). If the case were otherwise, an employee could "immunize" himself "from adverse employment action despite poor work performance,

bad attitude . . . etc., simply by filing" a claim under the FLSA or another employee-protecting statute. *Id.* Exelon noticed problems with Cichon's attitude and supervisory skills almost two years before he filed his FLSA suit. Without additional proof, he cannot show that Exelon's justifications were fabricated. Because he fails to establish that the proffered reasons for his termination and subsequent inability to secure a desired position at the Byron Plant are pretextual, his retaliation claim cannot survive summary judgment.

**IV. Exelon's Assertion that Cichon's Claims are Barred**

Exelon asserts that Cichon's lawsuit is barred because the *Meyers* court had already ruled on his retaliation claims. We need not decide this issue as summary judgment is granted for Exelon on the above grounds.

## CONCLUSION

Based on the foregoing analysis, we grant Exelon's motion for summary judgment.

_____
Charles P. Kocoras
Chief Judge
United States District Court

Dated: SEP 18 2003

-18-